William P. STANTON

v.

Irving MACHIZ, District Director of Internal Revenue Service,

and

Wendell B. Barnes, Administrator of Small Business Administration, an Agency of the United States.

Civ. A. No. 11539.

United States District Court
D. Maryland,
Civil Division.

May 12, 1960.

</div>

Karl F. Steinmann, Nicholas V. Broccolino, Baltimore, Md., for plaintiff.

Leon H. A. Pierson, U. S. Atty., John R. Hargrove, Asst. U. S. Atty., Baltimore, Md., John J. Gobel, Dept. of Justice, Washington, D. C., for defendants.

CHESNUT, District Judge.

The complaint in this case seeks to *enjoin* the collection of a penalty assessment in the amount of $22,506.46 made by the Baltimore District Director of the Internal Revenue Service on April 30, 1958 against the plaintiff, William P. Stanton, who was the president of the Jacques Brass Specialties Co. Inc., a Maryland corporation, doing business in Baltimore, Maryland. After answers had been filed by the defendants the case was tried on April 27 and 28, 1960. Counsel have been heard and their briefs carefully considered.

The Revenue Act of 1954, title 26 U.S.C.A. § 3402, provides a tax at certain rates on the income of employees which must be withheld by the employer at the time of the payment of wages. This is called a "withholding" tax. And title 26 U.S.C.A. § 3102 similarly provides that the employer in making payment of wages to employees should withhold the amount then due on the wages for social security taxes known as the Federal Insurance Contributions Act. For convenience both sums so to be withheld are very often referred to as "withholding taxes". Title 26 U.S.C.A. § 3501 requires that the taxes so withheld must be paid into the United States Treasury, and § 7501 provides that the sums so withheld shall constitute trust funds for the benefit of the United States and must be paid over as required by law. By Regulation the employer is required to make a return to the District Director for each three months' period in the year of the amount so withheld.

William P. Stanton, the plaintiff in this case, as president of the Jacques Brass Specialties Co. Inc., filed returns for the fourth quarter of 1955 showing the amount withheld on payment of wages to employees in the total amount of $11,433.60; and for the first quarter of 1956 he made similar returns showing the amount to be $10,673.30; and for the second quarter of 1956 in the amount of $10,484.44; and for a short period in the third quarter of $1,460.68. Neither Stanton nor the Brass Company paid any of these withheld taxes.

Title 26 U.S.C.A. § 6672 provides as follows: "Any person required to collect, truthfully account for, and pay over any tax imposed by this title who wilfully fails to collect such tax, or truthfully

account for and pay over such tax, or wilfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over. \* \* \*." It will be noted that the amount of the returns made by Stanton exceeded the amount of the assessment. This is explained by evidence in the case which showed that a substantial part of the taxes so withheld were later paid by the Small Business Administration, one of the defendants in the case, and also the amounts reported included the amount of the employer's required payment for social security tax. Counsel have stated that there is no question in this case with regard to the amount of the penalty assessment made by the District Director.

It is to be noted at once that this is not a case in which the plaintiff has paid the tax, filed a petition for a refund and is now suing to recover the amount of the tax so paid; nor is it a case in which the Government has started legal proceedings by enforcement of a lien or otherwise to collect the amount of the penalty assessment. It is simply a suit by the plaintiff to enjoin the collection of a penalty tax assessment. And as to such a suit, title 26 U.S.C.A. § 7421 provides:

"(a) Tax.—Except as provided in sections 6212(a) and (c), and 6213(a), no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court." And if the suit could be regarded as one to obtain a declaratory decree against the assessment it will be noted that 28 U.S.C.A. § 2201 excepts from authorization of declaratory judgment those suits involving federal taxes.

Title 26 U.S.C.A. § 3401 provides: "For purposes of this chapter, the term 'employer' means the person for whom an individual performs or performed any service, of whatever nature, as the employee of such person, except that—(1) if the person for whom the individual performs or performed the services does not have control of the payment of the wages for such services, the term 'employer' (except for purposes of subsection (a)) means the person having control of the payment of such wages, and \* \* \*."

The plaintiff attacks the assessment made against him on two counts: (1) that he was not in "*control* of the payment of the wages" and (2) that his failure to pay the taxes withheld was not *wilful*. The controlling facts shown by the papers and evidence in the case can be succinctly stated as follows:

1. Prior to 1954 the Brass Company, a Maryland corporation, was engaged in the manufacture of parts for airplanes and similar products. It was a "one man" corporation with Stanton as the only stockholder and also president, and his wife as another officer. Long prior to 1954 the corporation had borrowed money from the Reconstruction Finance Corporation and upon the latter's liquidation owed it $159,000. In order to partially pay this debt it applied to the Small Business Administration (hereinafter called S.B.A.) for a loan of $100,000 to be repaid in 18 months. The loan was agreed to on numerous stated conditions including the requirement of security to be given in the form of a deed of trust or mortgage covering all the physical assets of the corporation consisting of tools, fixtures, furniture, etc., and an assignment of subcontracts for airplane parts in the amount of 150% of the amount of the loan, and with the right to the S.B.A. to collect the payments on said contracts and to release or pay over to the Brass Company from time to time such amounts as the S.B.A. determined *in its discretion*. The $100,000 loan was applied on account of the $159,000 due the R.F.C.

2. The Brass Company had about 45 employees and its business was conducted wholly in a rented plant at Baltimore, Maryland. The S.B.A. was situated for the purposes of this loan at Richmond, Virginia. At no time did the S.B.A. or its officers take any part in the actual

conduct of the business of the Brass Company, and particularly gave no attention whatever, and in fact had no right to give attention, to the hiring or firing of employees or the handling of the moneys used by the Brass Company in payment of its running expenses, including wages; but it did at various times and in large amounts release and pay over to the Brass Company sums of money which it had received in payment of contracts made by the Brass Company with other persons. Stanton as president of the Brass Company, had sole authority to sign checks on funds of the Company.

3. In February 1956 the S.B.A. learned that the Brass Company had not paid the withheld taxes for the fourth quarter of 1955, which should have been paid by the Company by January 31, 1956. And in the agreement for extension of the loan dated March 26, 1956, one of the conditions therefor was that " * * * any and all taxes due the Federal Government or the State of Maryland, or the City of Baltimore or any other subdivision of the Federal, State or City Governments, to be immediately paid in full, * * *." The extension agreement also provided that the amount of contracts assigned to the S.B.A. which in the original authorization for the loan had been put at 150%, should be reduced to 100%. And it will be noted from the plaintiff's complaint that in August of 1955 the S.B.A. had agreed that contracts for not more than $1,000 need not be assigned.

4. The employees of the Brass Company were paid weekly the net amounts due to them after deducting the withholding taxes. It was of course clearly the duty of Stanton who signed the checks for the wage payments to have held in trust the amounts withheld from the employees and which had to be paid over to the Government during the month succeeding the quarter for which the returns were made by Stanton. After Mr. Tyree of the S.B.A. learned in February 1956 that the Brass Company had not paid the amount of the withheld taxes

for the fourth quarter of 1955, although many remittances of cash had been made to the Brass Company by the S.B.A., he decided that the S.B.A. instead of releasing some of its cash collateral (received on assigned accounts) should pay the amount of the withheld taxes directly to the Government and beginning May 2, 1956, it did so, the total amount so paid being $6,444.40; the information as to the amount withheld from the several employees having been obtained from the Brass Company.

5. The S.B.A. filed an itemized account of the total receipts by it from the proceeds of the assigned accounts which aggregated $462,106.73; and an itemized list of all releases that it had made directly to the Brass Company from its cash collateral so received and other disbursements that it had made for account of the Brass Company in the total amount of $449,586, as calculated by counsel for the defendant at the trial. I understand there is no controversy over these figures. It will be noted from this account that during the period of October 1, 1955 to February 1, 1956, the S.B.A. had collected on account of assigned contracts about $87,000, and during that period it had made cash remittances to the Brass Company in the amount of about $92,700. The amount of taxes due the Government January 31, 1956 was $11,433.60; and between February 1, 1956 and May 1, 1956 the S.B.A. made numerous releases to the Brass Company totalling in aggregate amount about $67,234; while the amount of the withheld taxes payable April 30, 1956 was only $10,673.30. It thus appears that in the period the S.B.A. released to the Brass Company more than the amounts that it had received in the same period and the Brass Company clearly had available sums of money for the running of its business which were more than amply sufficient to pay the taxes due to the Government. The inference would seem to be that if the Brass Company did not have sufficient funds to pay all its current expenses, the available cash must have been applied

to purposes other than the amounts withheld for taxes which, under the applicable law should have been held in trust by it for the particular purpose of payment to the Government.

6. On July 20, 1956 the Brass Company made a formal assignment for the benefit of creditors and on July 23, 1956 the Circuit Court No. 2 of Baltimore City assumed jurisdiction of the trust. In liquidation of assets of the net proceeds of that trust the sum of $1,618.04 was paid on account of the claim of the Government for taxes, not particularly specified.

7. On August 3, 1956 the S.B.A. through the trustee named in the mortgage trust agreement above referred to, executed at the time of the making of the loan of $100,000, foreclosed that mortgage in this court. In due course the property subject to the mortgage was sold and the sale confirmed in the absence of any exceptions thereto by any party in interest. The balance over expenses was paid by the trustee to the United States of America (the S.B.A.) in the amount of $69,205.75. In addition thereto the S.B.A. applied on account of the loan the balance remaining in the cash collateral account, from the proceeds of assigned contracts, $9,861.88. Together with other credits on account of the principal of the loan (not here in controversy) the final result was that the S.B.A. received payments of principal and interest of the $100,000 loan with the exception of a small amount of interest.

8. The plaintiff seeks to put the responsibility for the non-payment of the taxes on the S.B.A.; and, in the alternative to an injunction prays that the S.B.A. shall be required to pay the taxes. To this end he says that in a conference with Mr. Holden of the S.B.A. during negotiations prior to the extension agreement, the latter said that the S.B.A. wanted the business to continue until its loan was paid out and that otherwise the Brass Company could or would have discontinued the business. Holden, whose office is at Richmond, Virginia, did not attend the trial, but assuming that he had expressed this wish, there is nothing sufficient under all the evidence in the case to conclude therefrom that the plaintiff was legally obliged to continue the business against his will. And the expression in Stanton's letter of May 1, 1956 to the District Director asking postponement of the time for paying the taxes appeared quite inconsistent with his present statement. Also he did finally in July 1956 discontinue the business by an assignment for the benefit of creditors.

The principal contention of the plaintiff is that the tax assessment against him is invalid because he was not the person in "control of the payment of wages" to the employees of the Brass Company, and that on the contrary the S.B.A. was the person in control because it received the proceeds from the assigned contracts and must have known that the Brass Company did not have sufficient moneys to pay its ordinary current expenses and the taxes withheld. And the plaintiff therefore says that as the S.B.A. did receive the moneys and did not pay out to the Brass Company sufficient amounts to pay the taxes withheld, it is chargeable as the person in control of the payments to the employees. I find no basis for this untenable contention on the facts of the case. Some of the particular reasons for this conclusion will now be stated.

The only relation between the Brass Company and the S.B.A. was that of borrower and lender and the rights of the parties respectively were covered by written agreements consisting of the terms of the loan authorization, the security given by the deed of trust covering the physical assets of the Brass Company, the extension agreement and the so-called cash collateral resulting from payments under assigned contracts. In accordance with the agreement the S.B.A. had the legal right to receive these proceeds and hold them as cash collateral for ultimate repayment of the debt. And it had no obligation under the agreements to pay over or release to the Brass

Company any sums so received and held by it except in the amounts and at the discretion of the S.B.A. I find nothing in any of the evidence in the case to warrant the contention that the S.B.A. did not strictly and fairly adhere to the terms of the written agreements between the parties; and it took no actual or active part in the running of the business of the Brass Company. All the wages of employees were paid directly through the plaintiff, Stanton, who was the sole owner and stockholder of the corporation and alone had authority to draw checks on its funds.

The relation between the parties was simply that of a banker and borrower. Under similar factual situations it has been decided in a number of cases that Stanton had no legal excuse for his failure to pay over to the Government the taxes withheld by him from employees as and when they were paid. Bloom v. United States, 9 Cir., 1959, 272 F.2d 215; Westover v. William Simpson Const. Co., 9 Cir., 1954, 209 F.2d 908; Southern Warehouse Corp. v. Scofield, D.C.S.D.Tex.1952, 110 F.Supp. 553; United States v. Crosland Const. Co., 4 Cir., 1954, 217 F.2d 275.

The plaintiff's contention that the S.B.A. was responsible for the payment of the taxes is inconsistent with the written evidence in the case. In the extension agreement above referred to, after the S.B.A. had learned that Stanton had not paid the taxes for the fourth quarter of 1955, it was expressly provided as a condition of the extension that he must pay all the taxes which were due either to the Federal or State Governments with respect to the taxes theretofore withheld. And under date of May 1, 1956 Stanton wrote a letter to the District Director asking an extension for the time of payment of the overdue taxes for the fourth quarter of 1955. In the same letter he stated in substance that the financial situation of the Brass Company was only temporary as the S.B.A. had funds which could or would in due course be released, sufficient when received by the Brass Company, to pay the taxes and that the prospects of the Company for continuing a successful business were very encouraging.

The main conflict in the evidence was Stanton's statement as a witness that his failure to pay the taxes was due to the fact that when he requested the S.B.A. to advance money for the payroll for a particular week, Tyree sent him only the "net" amount of the wages to be paid without including the taxes withheld. It is my recollection that Tyree as a witness directly contradicted that statement. I note that the same statement was made by Stanton in his letter to the District Director but I do not find that a similar statement was made in any letter by Stanton to the S.B.A. As between these two contradictory statements I do not think the plaintiff has proven his contention by a preponderance of the evidence. On the contrary, the facts and other evidence in the case as a whole seem to me to more satisfactorily support Tyree's statement. But however that may be, I do not find any sufficient basis in the evidence as a whole to support the plaintiff's contention that he was justified in his failure to pay the taxes on that ground. While the S.B.A. filed itemized statements of its receipts and disbursements, the plaintiff has not furnished any detailed evidence as to the receipts by the Brass Company from the S.B.A. of the amounts advanced from time to time, and what application of such amounts was made by the Brass Company; nor has he furnished any detailed account of the receipts and disbursements of the Brass Company for the tax purposes in question.

The other contention of the plaintiff against the assessment is that his failure to pay the taxes was not "wilful". I do not think this contention is available to the plaintiff in this proceeding which is to enjoin the payment of the taxes. This is not a proceeding by the Government to enforce the collection of the tax by a sale of any assets of the plaintiff as to which a lien has attached; nor is it a proceeding to attach the plaintiff's salary as an employee of the Minneapolis Hon-

eywell Regulator Company. It appears that when the plaintiff was notified of the penalty assessment he appealed for an abatement thereof to the Appellate Division of the Internal Revenue Service and was notified April 13, 1959 " * * * there is no assessment of the 100% penalty to be abated". This injunction suit was filed November 16, 1959.

■ While I do not think this case requires a formal ruling whether the failure of the taxpayer to pay the tax was "wilful", I am disposed to think that in the context of the statute the plaintiff's failure to pay the tax can properly be considered as "wilful". Assuming that he had the obligation to pay the tax, his only excuse is that the Company at the time did not have sufficient funds to pay it and other pressing expenses. But the nature of this tax obligation is a very particular one in that when the employee is paid the employer is required to deduct the applicable taxes and the amounts thereof so deducted at the time constitute a trust fund for payment to the Government. Under the facts it is not disputed that the wages were paid by Stanton and when paid the deductions were made. He did not hold in trust such deductions as required by law and apparently applied the funds so deducted to other pressing current purposes. This was not an accidental but necessarily a deliberate choice on his part as to the use of these trust funds. In that sense it seems to me that the facts would justify the conclusion that the failure to pay the taxes was wilful.

■ The meaning of the word "wilful" depends upon the context in which it appears; and particularly the kind and nature of the statute. Where the term is used in connection with the statute defining criminal conduct, the word "wilful" usually requires something more than deliberate and intentional as opposed to accidental and includes an intent of a wrongful or evil purpose. For instance, see Spies v. United States, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418, relating to the use of "wilful" in former title 26 U.S.C.A. § 145(b) (1939 Code),

now § 7202 (1954 Code), 26 U.S.C.A. § 7202; Ingram v. United States, 360 U.S. 672, 79 S.Ct. 1314, 3 L.Ed.2d 1503. But where the statute relates to a civil rather than a criminal penalty the meaning of the word connotes only voluntary and intentional action as contrasted with accidental. Thus, in United States v. Illinois Central R. Co., 1938, 303 U.S. 239, 58 S.Ct. 533, 535, 82 L.Ed. 773, where the statute imposed a penalty on a common carrier for failure to water live stock after thirty-six hours, it was held that the word "wilful" did not require proof of an evil intent but that it is sufficient if the failure to act was either intentional or plainly indifferent to the requirements of the statute. In United States Fidelity & Guaranty Co. v. United States of America, D.C.Md.1958, 164 F.Supp. 703, Chief Judge Thomsen of this court classified the penalty imposed by 26 U.S.C.A. § 6672, the section involved in this case, as a civil penalty. See also Nugent v. United States, D.C.N.D.Ill.1955, 136 F.Supp. 875 and cases cited therein at page 879. See also particularly Int.Rev.Cum.Bull. No. 1, 1954, Rev.Rul. 54–158, discussing the meaning of the word "wilful" in the statute here involved and citing and quoting from particular decisions having similarity to the instant case. The Bulletin concluded, after reviewing various cases, as follows:

"In view of the foregoing, it is held that the 100% penalty provided in section 2707(a) of the Code [26 U.S.C.A. § 2707(a)] should be assessed in a case where money withheld from employees as taxes, in lieu of being paid over to the Government, was knowingly and intentionally used to pay the operating expenses of a business, or for other purposes".

On this point the plaintiff cites in support of his contention several cases which I have examined but which I think do not fairly support his contention. In Levy v. United States, D.C.W.D.La.1956, 140 F.Supp. 834 the District Judge held that the meaning of "wilful" in the statute was more than mere negligence and

as the facts showed only negligence, the taxpayer was not liable. The case is also distinguishable because it was not a suit to enjoin the tax but a suit by the taxpayer to recover the penalty assessment which he had paid. In Cushman v. Wood, D.C.Ariz.1956, 149 F.Supp. 644 the District Judge construed the term "wilful" as used in this particular statute as doing something without reasonable cause, and on the facts which were quite different from those in the instant case, he held the plaintiff, who had paid the assessment and was suing to recover it, was entitled to recover. In the instant case the plaintiff did not pay the assessment and is not here suing to recover the assessment that he has paid.

Apart from the above consideration of the case on its particular facts the Government contends that the primary purpose of this case is to enjoin the making or collection of a penalty assessment which is expressly prohibited by statute (26 U.S.C.A. § 7421) which, of course, has been in force for many years and has so frequently been judicially considered. There are some exceptions to the rigid statutory provision. See Miller v. Standard Nut Margarine Co., 1932, 284 U.S. 498, 52 S.Ct. 260, 76 L.Ed. 422; Gebelein Inc. v. Milbourne, D.C.Md.1935, 12 F.Supp. 105; Milliken v. Gill, 4 Cir., 1954, 211 F.2d 869. But I do not find any factors in the instant case which warrant an exception to the statute. There is no question here as to the constitutionality or other validity of the tax.

■■ The complaint here invoked the extraordinary equitable remedy of an injunction. It has long been an established principle of equity jurisprudence that in a case so clearly arising in equity the plaintiff must aver and prove that he has no remedy at law and that unless the defendant is enjoined he will suffer irreparable injury. As to a remedy at law, it appears that the plaintiff's remedy was to pay the assessment and afterwards sue to recover it. Although not discussed by counsel, it is my understanding that the plaintiff did not have the option to seek a review of the assessment in the United States Tax Court. McAllister v. Dudley, D.C.W.D.Pa.1956, 148 F. Supp. 548; C.C.H.Stan.Fed.Tax Rep. 1960, Vol. 5, pars. 5564 through 5569, especially 5566.01; Casey, Fed.Tax Practice, Vol. I, ss. 6.8, 6.9.

■■ I will assume also that if the plaintiff were defending a suit by the Government to enforce a lien by sale or attachment, the plaintiff as defendant therein could raise the question of wilfulness; but this case does not present any such aspect. It is baldly only a suit to enjoin an assessment prohibited by statute. In such a suit the plaintiff is also required to allege and prove irreparable injury. The decided cases dealing with what constitutes irreparable injury are legion in number and this case does not require extended consideration of that well known problem. In many cases where the court has found the existence of irreparable injury in suits to enjoin tax assessments, an important factor has been whether the enforcement of the assessment by foreclosure or sale of property subject to the lien of an assessment would be destructive of a going business, where the facts reasonably tend to indicate that a stay in the enforcement process for a reasonable time might well result in the voluntary payment of the taxes. In this case what the plaintiff relies on as showing irreparable injury is simply that he does not personally have the money to pay the assessment and that his only financial resources consist of his salary of $9,000 a year which he says is of itself not more than sufficient to support his family. While this present financial situation may well appeal to the discretionary authority of the Government as a creditor, I do not think it sufficiently alleges irreparable injury in the required legal sense.

In addition to these considerations the defendants also raise the question of the proper party defendant. They say that in a suit of this kind to restrain a tax assessment there is a lien in favor of the United States which has not been made a party to the case and therefore

the case must fail on jurisdictional grounds for that reason. However, I think it unnecessary to consider that further point in this case.

For these reasons I conclude that the complaint should be and it is hereby dismissed this 12th day of May, 1960.